**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**PALM BEACH DIVISION**

TWIN CITY FIRE INSURANCE          CASE NO. 13-80998-CIV-MARRA
COMPANY, a foreign corporation,

       Plaintiff,

vs

CR TECHNOLOGIES, INC.,
a Florida corporation,

       Defendant/Third Party Plaintiff

vs.

HARTFORD FIRE INSURANCE CO.,
a foreign corporation

       Third Party Defendant

_____

**DEFENDANT AND THIRD PARTY PLAINTIFF, CR TECHNOLOGIES, INC.'S,**
**MOTION FOR SUMMARY JUDGMENT**

       COMES NOW, the Defendant and Third Party Plaintiff, CR TECHNOLOGIES, INC., by

and through its undersigned attorneys, and pursuant to Federal Rule of Civil Procedure 56 hereby

files its Motion for Summary Judgment as to its First Affirmative Defense, Counterclaim, and

Third Party Claim, and in support thereof, states the following:

## I.      INTRODUCTION

       This is an action for declaratory relief regarding whether the Plaintiff, Twin City Fire

Insurance, Company, and the Third Party Defendant, Hartford Fire Insurance Company, owe a

duty to indemnify their insureds, US Datanet, Inc. and its subsidiary, USD-CLEC, for a final

judgment entered against them and in favor of Defendant/Third-Party Plaintiff, CRT in an underlying action.

The final judgment was entered against US Datanet and USD CLEC after a jury found each liable for various torts which ultimately resulted in CRT losing two computer systems it had initially leased to US Datanet and USD CLEC.

Twin City insured US Datanet and USD-CLEC under a Private Choice Encore Insurance Policy issued by Twin City bearing policy number KB 0240174-08. The Private Choice Encore Policy provided two coverages at issue here: Directors, Officers, and Entity Liability Coverage, and Crime Coverage.

Hartford Fire insured US Datanet under a Commercial General Liability Policy bearing policy number 01UUNGF6575.

## II.     STATEMENT OF MATERIAL FACTS

### The Underlying Action

On April 2, 2008, CRT initiated a civil action against US Datanet, Richard Shaw, and Jonathan Turner. On June 6, 2008, CRT filed its First Amended Complaint. The initial Complaint and the First Amended Complaint included counts for breach of contract, conversion, tortious interference with business relations, and violation of Florida's Deceptive and Unfair Trade Practices Act. (Complaint and First Amended Complaint are attached hereto as Composite Exhibit A)

As alleged in the initial Complaint, CRT owned an exclusive license to a Voice Over Internet Protocol (VOIP) software called Wildfire. (Composite Exhibit A, ¶18) US Datanet was a communication provider in the business of providing both VOIP and traditional communication services to its customers. (Composite Exhibit A, ¶21) US Datanet entered into discussions

regarding US Datanet renting equipment and software from CRT in order for US Datanet to provide VOIP services to its customers using the Wildfire software. (Composite Exhibit A, ¶¶ 22-23)

On March 1, 2004, CRT and USDC entered into a Rental Agreement whereby CRT agreed to rent a Wildfire VOIP computer system to US Datanet for a period of forty-two (42) months. Pursuant to the Agreement, US Datanet could purchase the Wildfire system at any time during the term of the Rental Agreement at a price based upon the number of subscribers using the rented system. (Composite Exhibit A ¶ 23; the Rental Agreement is Exhibit A to the Complaint)

On August 14, 2007, US Datanet's Chief Financial Officer and Senior Vice President wrote to CRT and informed CRT that US Datanet would not renew the Rental Agreement when it expired on September 30, 2007. (This correspondence is Exhibit B to the Complaint) Upon CRT's agent, William Haddad, arriving at US Datanet's headquarters in Syracuse, New York to retrieve the equipment on September 7, 2007, CRT was first informed by Richard Shaw that US Datanet would be keeping CRT's equipment and taking ownership of it. (Exhibit C to the Complaint; DE.81-1, p.22-23) On October 5, 2007, Haddad returned to US Datanet and picked up a Dell desktop computer which did not have any of the Wildfire equipment or software included. US Datanet retained possession of the server box and voice cards that belonged to CRT. (DE.81-1, pp.24-25, 53)

In October 2008, US Datanet filed for Chapter 11 Bankruptcy. (DE.79-1, p.18) In March 2009, the subject equipment was purchased by WVT Communications by way of an asset purchase agreement which was executed in connection with the bankruptcy proceedings. (DE.79-1, pp.88-92, 95-97, 98-99) John Turner, US Datanet's Executive Vice President and

3

Chief Strategy Officer, served as US Datanet's "Responsible Officer" in the bankruptcy proceedings. (Consent Order and Stipulation Declaring John Turner the Debtor's Responsible Officer, Motion for Order Authorizing Trustee to Retain John Turner as Consultant, and Turner Affidavit are attached hereto as Composite Exhibit B) Those documents document Turner's "institutional knowledge and familiarity with the Debtors' books and records." (Exhibit B, p.5)

In September 2010, CRT filed a Second Amended Complaint adding Frank Caruso as an individual Defendant, **adding USD CLEC, Inc. as a corporate Defendant**, and adding a claim for Negligent Misrepresentation. (Second Amended Complaint) USD CLEC is a subsidiary of US Datanet and, thus, an insured under the Twin City policy, as Twin City acknowledged before the bankruptcy court. (Twin City's Objection to CRT's Motion for Order Approving Sale of Debtors' Insurance Policies is attached hereto as Exhibit G, see pp.1-4; NYS Department of Corporations, Entity Information is attached hereto as Exhibit K) The Second Amended Complaint alleged counts for conversion, civil theft, tortious interference with business relations, violation of Florida's Deceptive and Unfair Trade Practices Act, and negligent misrepresentation against USD CLEC. (DE.1-3)

As to Count I (Breach of Contract), Count II (Conversion), Count IV (Tortious Interference With Advantageous Business Relationships) and Count VI (Negligent Misrepresentation), the Second Amended Complaint sought the same special damages. Specifically, these counts each sought the following:

    a) The loss of the value of the computer hardware as of the time of the breach;

    b) The loss of the value of the software licenses loaded onto the hardware as of the time of the breach;

    c)  The costs associated with the attempts to remove the equipment from USDC's facilities;

    d)  The replacement costs of the rented CRT Wildfire system and the co-located CRT Wildfire system;

    e)  Loss of income from existing customers as a result of USDC's termination of service to CRT's customers; and

    f)  Loss of goodwill from existing and potential future customers as a result of USDC's termination of service to CRT's customers.

(DE.1-3, ¶¶ 55, 66, 80, 95) These Counts also sought pre- and post-judgment interest. Count III (Civil Theft) sought treble damages pursuant to section 772.11, Florida Statutes. Count V (Florida Deceptive and Unfair Trade Practices) sought compensatory damages, special damages, attorney's fees, costs, and pre-and post-judgment interest.

In the underlying litigation, CRT propounded discovery seeking information as to whether Twin City had issued a reservation of rights letter or otherwise indicated that coverage may not apply. By way of interrogatories, CRT asked the following:

    17.  Has the insurance company listed in answer to number 16 above issued any indication that coverage may not apply, be denied or any other coverage issues, and if so, please state with specificity what the insurance company position is?

    18. Has the insurance company issued a reservation of rights notice or any waiver of rights agreements to Defendant? If yes, please state with specificity which insurance company, which insurance policies, the name of the individual who signed the reservation notice on behalf of the insurance company, and date received by Defendant.

In response to the interrogatories, John Turner stated "Unknown." (May 2012 Interrogatories and Answers to Interrogatories are attached hereto as Composite Exhibit C, see par. 17-18)[1]

In October 2012, the underlying action proceeded to jury trial. By way of a special interrogatory verdict form, a jury found US Datanet breached the contract; US Datanet

---

[1] By way of Request to Produce, CRT sought "[a]ny and all reservation of rights letters, waiver of rights letters and/or correspondence denying coverage of this action/claim/lawsuit." (May 2012 Request to Produce, par.6) US Datanet never responded to the request.

committed civil theft; US Datanet engaged in unconscionable, immoral, unfair or deceptive acts which caused damage to CRT; US Datanet made a negligent misrepresentation to CRT which it intended CRT to rely on, which CRT did rely on, and which reliance caused damages to CRT. As to USD CLEC, the jury found USD CLEC liable for conversion and civil theft. (DE. 1-4)

At trial, CRT sought the replacement cost of its equipment and software. Evidence at trial proved that each set of CRT equipment totaled $70,775.60. (Exhibit 52 from the underlying trial is attached hereto as Exhibit D) There were two sets of CRT equipment provided to and wrongfully retained by US Datanet – one had been for CRT's use and one for US Datanet's use. (DE.80-1, pp. 26, 31-32) The jury awarded **exactly two times the replacement cost of one set of equipment** in deciding that CRT incurred damages in the amount of $141,551.20. (DE.1-4, p.3) The verdict form did not ask the jury to allocate its damage award to any specific cause of action.

On July 29, 2013, the trial court entered final judgment in favor of CRT and against US Datanet in the amount of $644,746.53 plus post-judgment interest and against USD CLEC in the amount of $474,284.98 plus post-judgment interest. The amount of final judgment includes the amount of the verdict ($141,551.20), trebled pursuant to section 772.11, Florida Statutes ($424,653.60). As to US Datanet, the final judgment also awarded contractual interest at the rate of 1.5% per month since the date the Complaint was filed ($220,086.93). Finally, the final judgment acknowledges that CRT is entitled to recover the total sum of $644,746.53, of which $474,284.98 is assessed against both US Datanet and USD CLEC, which either may satisfy, and the remaining $170,461.55 is assessed only against US Datanet. (DE.1-5)

**Twin City Private Choice Encore Policy**

At the time the initial Complaint was filed, US Datanet was insured by a Private Choice Encore Insurance Policy issued by Twin City bearing policy number KB 0240174-08. The Private Choice Encore Policy provided three coverages: Directors, Officers, and Entity Liability Coverage, Employment Practices Liability Coverage and Crime Coverage. (Schedule of Forms and Endorsements)

By letter dated August 14, 2008, Twin City claims adjuster, Brian Beal, purportedly wrote to US Datanet and advised that Twin City had reviewed the Complaint. Beal addressed the letter to Thomas Harig at Fayetteville Agency at 7153 East Genesee Street, P.O. Box 403, Fayetteville, NY 13066. Beal identified Harig as "the Insured's representative for receipt of insurance materials." (August 2008 Letter is attached hereto as Exhibit E, see p.1) The letter also indicates it was provided to John Turner. (Exhibit E, p.5)

Mysteriously, however, it does not appear the Fayetteville Agency even existed at the time of Beal's August 2008 letter. The New York State Department of Financial Services documents the Fayetteville Agency as having come into existence on March 11, 2013 – nearly five years after Beal's letter in the underlying action. (Licensee Detail for Fayetteville Agency, Inc. is attached hereto as Exhibit F) The Twin City policy was produced by Harig in January 2008 while at North Country Estates, Inc. with an address of 5427 Shady Avenue, Lowville, NY 13367. (DE. 1-6, p.2)

The August 2008 letter advised Twin City had reviewed the Complaint and had determined that coverage may be precluded under the Private Choice Policy on two bases.

First, as to the claims against the entity (US Datanet), Twin City stated:

Pursuant to the Policy exclusions of Section V of the Directors and Officers part, Twin City shall not pay Loss under Insuring Agreement C (Entity Liability) for any Claim:

Based upon, arising from, or in any way related to any liability under any contract or agreement, provided that this exclusion shall not apply to the extent that liability would have been incurred in the absence of such contract or agreement.

(Exhibit E, p.2)

As to the individual named Defendants, John Turner and Richard Shaw, Twin City pointed to another policy exclusion:

We further note that coverage may be precluded for the above referenced Insured Persons. Section IV of the Directors and Officers Liability Coverage Part, as amended by Endorsements #5 and #10, provides that Twin City shall not pay any Loss for any Claim:

Based upon, arising from, or in any way related to the gaining of any personal profit, remuneration, or advantage to which the Insureds are not legally entitled if a judgment or other final adjudication establishes that such a gain did occur; or

Based upon, arising from, or in any way related to any deliberately or intentional fraudulent or criminal act or omission or any willful violation of the law by the Insureds if a judgment or other final adjudication establishes such an act, omission, or violation of the law by the Insureds if a judgment or other final adjudication establishes such an act, omission, or violation.

(Exhibit E, p.2-3)

Ultimately, Twin City advised US Datanet that its coverage position was "premised upon the allegations asserted and presently known facts." Therefore, it was "subject to change as additional allegations and facts develop." Twin City reserved all rights. (Exhibit E, p.4) The letter was silent as to potential coverage under the Crime Coverage Part of the policy.

Twin City provided a defense to US Datanet and, after the Second Amended Complaint, to USD CLEC through the entry of final judgment in the underlying action. (Exhibit G, p.6) Even though the Second Amended Complaint added a claim for negligent misrepresentation

8

against US Datanet, and added USD CLEC as a named Defendant, Twin City never issued a subsequent reservation of rights letter to US Datanet until **after** the jury verdict was rendered. As to USD CLEC, Twin City never issued **any** reservation of rights letter until **after** the jury verdict. (Twin City's January 2013 Reservation of Rights letter is attached hereto as Exhibit H) As to both US Datanet and USD CLEC, Twin City never disclaimed coverage.

CRT repeatedly requested a coverage position from Twin City and Hartford Fire in the underlying action. While Hartford Fire responded, Twin City simply ignored CRT's requests for information until after the conclusion of the trial and the rendition of a verdict. (Correspondence between CRT and the Hartford Entities is attached hereto as Composite Exhibit I)

**Hartford Fire General Liability Policy**

US Datanet was also insured by a General Liability Policy issued by Hartford Fire bearing policy number 01UUNGF6575, which policy was effective from July 1, 2007 until July 1, 2008. (DE.78-1) Hartford Fire disclaimed coverage of the underlying dispute under this policy in November 2008, December 2008, and again in September 2010. (November 21, 2008, December 17, 2008, and September 2010 Disclaimers are attached hereto as Composite Exhibit J) As shown herein, however, the underlying action comes within this policy's coverage provisions.

### III.    MEMORANDUM OF LAW

Twin City's petition for declaratory relief, CRT's Counterclaim, and CRT's Third Party Claim against Hartford Fire each turn on an interpretation of the insurance policies in light of the

foregoing facts regarding the underlying litigation. The Second Circuit Court of Appeals[2] has

aptly described the standards which apply here:

> We start our analysis with the premise that an insurance policy, like any contract, must be construed to effectuate the intent of the parties as derived from the plain meaning of the policy's terms. If the language of the insurance contract is unambiguous, we apply its terms. Where its terms are reasonably susceptible to more than one interpretation, the policy must be regarded as ambiguous.
>
> When a court decides, after examination of the contractual language, that an insurance policy is ambiguous, it looks outside the policy to extrinsic evidence, if any, to ascertain the intent of the parties. If, as is often the case, the ambiguities "cannot be resolved by examining the parties' intentions, then the ambiguous language should be construed in accordance with the reasonable expectations of the insured when he entered into the contract." In such situations the ambiguities in the policy ordinarily are construed in favor of coverage and against the insurer, because as the drafter of the policy the insurer is responsible for the ambiguity. Even though a contract may be ambiguous, summary judgment may nonetheless be appropriate where a court is in position to resolve the ambiguities through a legal, rather than factual, construction of its terms.

Andy Warhol Found. for Visual Arts, Inc. v. Fed. Ins. Co., 189 F.3d 208, 215 (2d Cir. 1999)

(quoting Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 695 (2d Cir.1998)) (additional

citations omitted).

Applying the foregoing to the undisputed facts outlined herein, the final judgment entered in

favor of CRT and against US Datanet is covered by the policies issued to US Datanet by Twin

City and Hartford Fire. Accordingly, this Honorable Court should grant summary judgment in

favor of CRT.

---

[2] It is undisputed the subject policies were issued and delivered in New York. As such, New York law governs this Court's interpretation and application of the policies. "When the contract deals with an insurance policy, the *locus contractus* is generally the state where the insured executed the insurance application." AIG Premier Ins. Co. v. RLI Ins. Co., 812 F. Supp. 2d 1315, 1319 (M.D. Fla. 2011) (quoting Am. United Life Ins. Co. v. Martinez, 480 F.3d 1043, 1060 (11th Cir.2007)).

## A.  TWIN CITY

**1.  <u>Coverage Exists Under the Directors, Officers, and Entity Liability Coverage Part</u>**

Insuring Agreement (A) provides for Insured Person Liability as follows:

> The Insurer shall pay **Loss** on behalf of the **Insured Persons** resulting from an **Insured Person Claim** first made against the **Insured Persons** during the **Policy Period** or **Extended Reporting Period**, if applicable, for a **Wrongful Act** by the **Insured Persons**, except for loss that an **Insured Entity** pays to or on behalf of the **Insured Persons** as indemnification.

Insuring Agreement (C) provides for Entity Liability as follows:

> If Entity Liability Coverage is included in Item 5 of the Declarations, the Insurer shall pay **Loss** on behalf of an **Insured Entity** resulting from an **Entity Claim** first made against such Insured Entity during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insured Entity**.

(D&O, p.1)

The policy provides the following definitions:

(A) "Claim" means any
    (1) Insured Person Claim;
    (2) Entity Claim; or
    (3) Derivative Demand.

…

(D) "Entity Claim" is defined to include any

    (1)    written demand for monetary damages or non-monetary relief commenced by the receipt of such demand;
    (2)    civil proceeding commenced by service of a complaint or similar pleading; or
    (3)    criminal proceeding commenced by the return of an indictment.

…

(E) "Insured Person" means any

    (1) Manager, or
    (2) Employee

…

(G) "Insureds" means any:

    (1) Insured Entity; or
    (2) Insured Person

…

(I) "Loss" means the amount that the Insureds are legally obligated to pay as a result of a Claim, including without limitation, Defense Costs, Investigation Costs, damages, settlements, judgments, and pre- and post-judgment interest.

Loss shall include punitive and exemplary damages where insurable by law…

…

(L) "Wrongful Act" means any actual or alleged:

    (1) error, misstatement, misleading statement, act, omission, neglect or breach of duty; or

    (2) matter claimed against an Insured Person solely by reason of their serving in such capacity, including service in an Outside Capacity.

(DE.1-6, pp.22-24)

In addition, the Policy defines "Insured Entity" to include (1) the Named Entity, and (2) any Subsidiary. (DE.1-6, p.12) "Subsidiary," in turn, is defined in relevant part as any "(1) corporation in which and so long as the Named Entity owns or controls, directly or indirectly, more than 50% of the outstanding securities representing the right to vote for the election of the board of directors of such corporation; (2) limited liability company in which and so long as the Named Entity owns or controls, directly or indirectly, the right to elect, appoint or designate more than 50% of such entity's managers." (DE.1-6, p.13)

The final judgment entered in favor of CRT and against US Datanet and USD CLEC is a covered loss under the Directors, Officers, and Entity Liability Coverage Part. Twin City is obligated to pay "**Loss** on behalf of an **Insured Entity** resulting from an **Entity Claim** first

made against such Insured Entity during the **Policy Period** or Extended Reporting Period, if applicable, for a **Wrongful Act** by the **Insured Entity**."

US Datanet and its subsidiary, USD CLEC, are each an Insured Entity. The jury found US Datanet liable for breach of contract, conversion, civil theft, violation of Florida's Deceptive and Unfair Trade Practices Act, and negligent misrepresentation, and awarded CRT damages in the amount of $141,551.20. As a result, US Datanet is now legally obligated to pay the amount of damages awarded by the jury, treble damages, and pre- and post-judgment interest. Similarly, the jury found USD CLEC liable for conversion and civil theft. As a result, USD CLEC is now legally obligated to pay the amount of damages awarded by the jury, treble damages, and pre- and post-judgment interest. Thus, the final judgment is a "Loss" as that term is defined by the policy.

Contrary to Twin City's contention in Count I of its Complaint for Declaratory Relief, the portion of the final judgment for treble damages is also a "Loss" within the meaning of the policy. Treble damages were awarded in the underlying action pursuant to Florida's civil theft statute. In Snyder v. Bell, 746 So. 2d 1096 (Fla. 2d DCA 1999), the Second District held "Florida's civil theft statute is without question remedial, rather than punitive, in nature." Id. at 1098;[3] accord Alea London Ltd. v. Am. Home Servs., Inc., 638 F.3d 768, 777 (11th Cir. 2011) ("[T]reble damages statutes defy easy categorization as compensatory or punitive in nature. Whether treble damages under a given statute are considered compensatory or punitive is an

---

[3] CRT acknowledges the Fourth District held to the contrary in Country Manors Ass'n, Inc. v. Master Antenna Sys., Inc., 534 So. 2d 1187, 1195 (Fla. 4th DCA 1988). However, CRT respectfully submits the Fourth District overlooked or misapprehended the remedial nature of treble damages later identified by the Snyder Court based on the plain language of sections 772.11 and 812.037, Florida Statutes. Any doubt regarding the nature of such damages should be construed in favor of providing coverage.

intensely fact-based inquiry that may vary statute-to-statute"). In <u>Alea</u>, the Court summarized a litany of United States Supreme Court cases characterizing treble damages as "remedial" which led the Alea Court to determine the treble damages awarded in that case were must more akin to compensatory damages and were covered. In this case, the award of treble damages was made under the civil theft statute, are remedial in nature, and akin to compensatory damages, which are plainly included in the policy's definition of "Loss."

Furthermore, that portion of the definition of "Loss" which discusses "punitive and exemplary" damages, and the "multiple portion of any multiplied damage award," is ambiguous. Here, the policy's definition of "Loss" employs the terms "punitive" and "exemplary" damages without providing any definition of either term, and states that "Loss" shall include such damages where insurable by law. However, the definition later provides that "Loss" shall not include "…the multiple portion of any multiplied damage award." (DE.1-6, p.24) Nowhere does the definition specifically reference treble damages, which have been recognized as "difficult to categorize." <u>Alea</u>, supra.

Indeed, in <u>Alea</u>, the Eleventh Circuit noted that the Insurer could have drafted the Policy's punitive damages exclusion to expressly bar coverage for "treble damages," but did not. Accordingly, the <u>Alea</u> Court found the policy ambiguous, construed it in favor of coverage, and determined that the policy provided coverage for treble damages. <u>Id.</u> at 779. Similarly, in this case, to the extent that there is uncertainty as to whether treble damages are compensatory in nature, and the policy's definition could be construed to either include or exclude that portion of the final judgment, it should be construed in favor of coverage pursuant to well-established precedent. <u>See</u>, <u>e.g.</u>, <u>Sokolowski on Behalf of M.M. & P. Pension Plan v. Aetna Life & Cas. Co.</u>, 670 F. Supp. 1199, 1206 (S.D.N.Y. 1987) ("The phrase defining 'damages' as 'compensation for

14

loss' must be construed broadly to the extent it is ambiguous because it defines coverage and originated with the insurer").

Finally, the allegations in the Second Amended Complaint and the jury's related findings bring the conduct of US Datanet and USD CLEC firmly within the policy's definition of "Wrongful Act." The various counts detailed US Datanet's and USD CLEC's conduct which plainly involved "error, misstatement, misleading statement, act, omission, neglect or breach of duty." (See generally DE.1-3)  For example, the allegations in support of the claim for negligent misrepresentation included the following:

- US Datanet, Shaw, Turner, Caruso, and USD CLEC misrepresented the material fact that they wished to solely rent equipment and software from CRT.

- US Datanet, Shaw, Turner, Caruso, and USD CLEC misrepresented the material fact that they wished for CRT to retrieve the CRT Wildfire system.

- US Datanet, Shaw, Turner, Caruso, and USD CLEC made these misrepresentations without knowledge of their truth or falsity, or should have known the representations were false.

- US Datanet, Shaw, Turner, Caruso, and USD CLEC intended to induce CRT to act on these misrepresentations.

- CRT acted in justifiable reliance on these misrepresentations by providing the equipment and software to US Datanet in New York.

- CRT was damaged by its reliance upon these misrepresentations in that it suffered both the loss of use and actual loss of its equipment and software.

DE.1-3, ¶¶ 83-94) Similarly, the Second Amended Complaint alleged, "All Defendants, excepting Caruso, deprived CRT of its right to possession of the rented CRT Wildfire System" which was "inconsistent with CRT's property rights." (DE.1-3, ¶¶ 63-64) The other Counts likewise detail "Wrongful Acts" by both US Datanet and USD CLEC. (See generally DE.1-3)

**2.  Twin City Should Be Estopped From Denying Coverage Under the Directors, Officers and Entity Liability Coverage Part**

"Under New York common law, an insurer, who undertakes the defense of an insured, may be estopped from asserting a defense to coverage, no matter how valid, if the insurer unreasonably delays in disclaiming coverage and the insured suffers prejudice as a result of that delay." Bluestein & Sander v. Chicago Ins. Co., 276 F.3d 119 (2d Cir. 2002). "Further, prejudice to an insured may be presumed 'where an insurer, though in fact not obligated to provide coverage, without asserting policy defenses or reserving the privilege to do so, undertakes the defense of the case, in reliance on which the insured suffers the detriment of losing the right to control its own defense.'" Id. (quoting Albert J. Schiff Assocs. Inc. v. Flack, 51 N.Y.2d 692, 699, 435 N.Y.S.2d 972, 417 N.E.2d 84 (1980).

In Bluestein, a professional liability insurer undertook the defense of a legal malpractice claim made against the insured. The damages claimed in the legal malpractice action included attorney's fees which had been paid to the insured. More than two years after receiving the initial complaint, the insurer informed its insured for the first time that it was disclaiming coverage for that portion of any award for the return of legal fees based on language contained in the policy excluding coverage for the 'return of fees or other consideration paid to the Insured.' Id. at 121. The Second Circuit Court of Appeals affirmed the district court's ruling that the insurer was estopped from disclaiming coverage of the attorney's fees award because its delay in disclaiming coverage was unreasonable. The Court then held prejudice to the insured must be presumed because the insurer controlled the insured's defense for over two years before disclaiming coverage. The Court also found actual prejudice based on a lack of evidence that counsel for the insured explored the significance of the claimant's claim for the return of legal fees. Id. at 122. See also Gen. Acc. Ins. Co. of Am. v. Metro. Steel Indus., Inc., 9 A.D.3d 254, 780 N.Y.S.2d 128

(App. Div. 2004) ("Plaintiffs will not be heard to argue that the subject "builder's risk" policy provides only first-party coverage for damage to specified property, not third-party liability coverage for breach of contract claims, where they undertook the defense of the underlying action for breach of contract without reserving their right to assert noncoverage, and defendant as a result lost control of its own defense.")

It is undisputed that USD CLEC, a subsidiary of US Datanet and an Insured Entity under the policy, was added as a named Defendant in the underlying action in September 2010. Twin City provided a defense to USD CLEC but never issued a reservation of rights to USD CLEC until **<u>after</u>** the jury verdict and has never disclaimed coverage of the various claims made against USD CLEC. Based on these undisputed facts, and the reasoning of <u>Bluestein</u>, Twin City should be estopped from denying coverage of the final judgment entered against USD CLEC in the amount of $474,284.98 plus post-judgment interest. Prejudice to USD CLEC must be presumed because Twin City controlled USD CLEC's defense through rendition of the jury verdict and entry of final judgment without ever disclaiming coverage. Indeed, Twin City never even issued a reservation of rights letter to USD CLEC until January 2013 – more than two months after the jury reached its verdict against USD CLEC.

As to its Insured, US Datanet, Twin City defended the entire underlying action through entry of final judgment without ever disclaiming coverage. Twin City allegedly authored a single reservation of rights letter in August of 2008. That letter was sent to an agency that seems not to have existed at that time, did not disclaim coverage, and was ambiguous at best. The letter pointed to two policy exclusions, one which Twin City characterized as "applicable to Insured Entities" and the other which was characterized as applicable to "Insured Persons." (Exhibit E) As to the Insured Entity, the letter stated that, because the wrongful acts outlined in the

Complaint "arise from alleged breaches of the contract entered into between the Insured Entity and the plaintiff" coverage was excluded for the Insured Entity under an exclusion in Section V pertaining to liability under a contract or agreement. As to the Insured Persons, the letter stated that coverage "may be precluded for the above referenced Insured Persons" under two exclusions (K and L) in Section IV of the Directors and Officers Liability Coverage Part.

A typical reservation of rights letter does most, if not all, of the following: (1) identifies the policy at issue; (2) quotes, or at least refers to, the relevant policy provisions and identify any terms, conditions, or exclusions which may bar coverage; (3) refers to specific, relevant allegations in the complaint; (4) identifies which claims may not be covered; (5) explains in detail the basis for the insurer's coverage position; (6) sets forth the proposed arrangement for providing a defense and, depending on the law of the jurisdiction, advises the insured of its right to independent defense counsel; (7) advises the insured of any actual or potential conflicts of interest between the insurer and the insured; (8) reserves the right to withdraw from the defense; (9) contains a general reservation of rights, including the right to assert other defenses the insurer may subsequently learn to exist during further investigation; and (10) uses the words "reservation of rights." 1 Leo Martinez, Marc S. Mayerson & Douglas R. Richmond, *New Appleman Insurance Law Practice Guide* § 11.11[2][b] (2012); 14 Steven Plitt, Daniel Maldonado, Joshua D. Rogers & Jordan R. Plitt, *Couch on Insurance* § 202:47 (3d ed.2013).

The severe shortcomings of Twin City's August 2008 reservation of rights letter are most apparent when that letter is compared to Twin City's (post-verdict) January 2013 reservation of rights letter. All of the ambiguities and uncertainties of that letter will not be included herein – only by reading that letter in its entirety can this Court fully comprehend its vague and confusing nature.

The August 2008 letter was addressed to Thomas Harig at Fayetteville Agency purportedly in his capacity as the Insured's representative, and indicates it was also sent to John Turner. Two very troubling mysteries exist here: first, Fayetteville Agency did not exist in August 2008, and second, Turner responded "unknown" when asked by way of interrogatories in the underlying action whether US Datanet had received any reservation of rights letters from Twin City. (Composite Exhibit C) Turner, who served as US Datanet and USD CLEC's Responsible Officer in the bankruptcy proceedings and who had "institutional knowledge" of the corporations' books and records, did not know whether there had been a reservation of rights letter issued.

Assuming *arguendo* that the August 2008 letter produced in this matter was actually authored and mailed in August 2008, the letter spans just over four (4) pages, and completely ignores the claim for civil theft which was included in both the initial Complaint and First Amended Complaint filed prior to the date of the letter. The letter cites two different policy numbers: KB 0240174 in the header, and KB 0248371 in the body. Without explanation, the letter conclusively states that "the wrongful acts alleged against the Insured Entity are related to liability under a contract or agreement," and thus, that coverage is precluded under "Policy exclusions of Section V of the Directors and Officers Part." Then, the letter asserts "coverage may be precluded" as to unidentified "above referenced Insured Persons" under two exclusions listed in Section IV of the Directors and Officers Liability Coverage Part. The letter outlines defense arrangements and purportedly attaches Twin City's Litigation Guidelines which defense counsel must comply with if Twin City consents to retention of defense counsel. Finally, the letter requests additional information to factor into its "coverage analysis" and advises that Twin City continues to "reserve all rights" including the right to "supplement and/or deny coverage."

By contrast, Twin City's January 2013 post-verdict reservation of rights letter was addressed directly to John Turner for US Datanet and to John Turner and David Montario for USD CLEC. (Exhibit H) This letter was sent via Certified Mail. The January 2013 letter spans nine pages and provides a detailed analysis of the Second Amended Complaint, the verdict, relevant provisions of the policy (KB 0240174-08), how certain provisions of the policy apply to the facts of the underlying case. The letter includes headers entitled "RESERVATION OF RIGHTS TO DATANET", "RESERVATION OF RIGHTS TO USD CLEC", and "ADDITIONAL RESERVATIONS." Each Reservation of Rights section details which specific policy exclusions might apply to exclude coverage and why.[4]

An insured who received the August 2008 letter would be left with many doubts and questions regarding Twin City's coverage stance, while an insured in receipt of the January 2013 reservation of rights letter would have a clear understanding of the Insurer's coverage position and policy support for same. Unfortunately for USD CLEC, it never received any reservation of rights letter until January 2013 after the jury verdict. Unfortunately for US Datanet, the unambiguous reservation of rights letter was never issued until after the jury had returned its verdict finding it liable to CRT for significant monetary damages. Unfortunately for CRT, despite numerous requests, it had no knowledge of any potential coverage issue until after the jury's verdict.

In <u>Hartford Underwriting Ins. Co. v. Greenman-Pederson, Inc.</u>, 111 A.D.3d 562, 975 N.Y.S.2d 736, (App. Div. 2013), the First Department of New York compared a purported

---

[4] Another useful comparison can be made between the August 2008 letter issued by Twin City and the letters issued by Hartford Fire regarding the Commercial General Liability policy's lack of coverage for the underlying claim. (See Composite Exhibit J) Each letter sent by Hartford Fire was sent to each named Defendant and insured. Each letter sent by Hartford Fire was sent via Certified Mail. Finally, Hartford Fire issued a renewed reservation of rights letter after it received and reviewed the Second Amended Complaint.

reservation of rights letter issued by Hartford to a "clear" disclaimer of coverage made in <u>QBE Ins. Corp. v Jinx-Proof Inc</u>. (102 A.D.3d 508, 511 [1st Dept 2013]). Where the letter issued in <u>QBE</u> clearly stated that "QBE . . . will not be defending or indemnifying you," the Court found that "Hartford's 2006 and 2008 letters failed the essential purpose of a disclaimer: to timely and clearly inform the insured of where the insurer stands on the issue of coverage for the action, and why, so that the insured can promptly consider appropriate alternatives." <u>Hartford</u>, 111 A.D. 3d at 563. Similarly, in this case, Twin City's August 2008 letter, if considered a reservation of rights, failed in its essential purpose of timely and clearly informing the Insured of the coverage issues which might apply to the action brought by CRT.

Based on the foregoing, CRT moves this Honorable Court to grant summary judgment as to CRT's First Affirmative Defense and hold that, as a matter of law, Twin City is estopped from denying coverage of the final judgment entered against its Insureds, US Datanet and USD CLEC.

3.  **Coverage Exists Under the Crime Coverage Part**

The Private Choice Encore Policy also included a Crime Coverage Part which included coverage for "Employee Theft," and provided in relevant part:

(A)     INSURING AGREEMENT 1. – EMPLOYEE THEFT

The insurer will pay for direct loss of or damage to **Money**, **Securities**, and **Other Property** that results from **Theft** by an **Employee**, whether or not identifiable, while acting alone or in collusion with others.

(DE.1-6, p.35) "Theft" is defined to include "the unlawful taking of Money, Securities, or Other Property to the deprivation of the Insured." "Employee" is defined to include:

(1) any natural person:

    a.  while in the Insured's service or for 60 days after termination of service; and

    b.  whom the Insured compensates directly by salary, wages, commissions, and

    c.  whom the Insured has the right to direct and control while performing services for it; including one:

    d.  who is a director or trustee while performing acts coming within the scope of the usual duties of an Employee or while acting as a member of any of the Insured's elected or appointed committees to perform on the Insured's behalf, specific, as distinguished from general directorial acts…

(DE.1-6, p.37)

    The undisputed facts from the underlying action, as outlined herein, prove that US Datanet's employee, Richard Shaw, acted to take the computer system owned by CRT and leased by US Datanet. The taking of the computer system by one or several US Datanet employees ultimately resulted in a loss to US Datanet because such taking resulted in a money judgment against US Datanet. Accordingly, under Insuring Agreement 1 of the Crime Coverage Part, Twin City must indemnify US Datanet for the final judgment and damages incurred by US Datanet as a result of its employee's theft.

    Furthermore, Twin City should be estopped from relying on any of the exclusions listed in the Crime Coverage Part under the same analysis provided in subsection A.2 of this memorandum – namely, Twin City wholly failed to address the Crime Coverage Part in its August 2008 letter. Notably, that letter did address the Employment Practices Liability part, even if just to state that the reported loss did not implicate the Employment Practices Liability part. However, the August 2008 letter made absolutely no mention of the Crime Coverage Part, much less any of the potentially applicable exclusions. Accordingly, Twin City should be estopped from relying on any exclusions in the Crime Coverage Part in order to deny coverage of the judgment for civil theft.

Even if Twin City can properly rely on the exclusions contained in the crime coverage part, the potentially applicable exclusions are ambiguous and must be construed in favor of coverage. "An exclusion must be specific and clear, and will be narrowly construed and enforced only when the insurer establishes that the pertinent language is 'subject to no other reasonable interpretation'" Essex Ins. Co. v. Grande Stone Quarry, LLC, 82 A.D.3d 1326, 1327 (App. Div. 2011). "Under New York law, 'before an insurance company is permitted to avoid policy coverage, it must satisfy the burden which it bears of establishing that the exclusions or exemptions apply in the particular case, and that they are subject to no other reasonable interpretation.'" Newman Myers Kreines Gross Harris, P.C. v. Great N. Ins. Co., 2014 WL 1642906 (S.D.N.Y. Apr. 24, 2014) (quoting Seaboard Sur. Co. v. Gillette Co., 64 N.Y.2d 304, 311, 486 N.Y.S.2d 873, 476 N.E.2d 272 (1984)). Finally, "[i]f the language is ambiguous, the ambiguity will be construed in favor of the insured, and 'the test to determine whether an insurance contract is ambiguous focuses on the reasonable expectations of the average insured upon reading the policy and employing common speech'" Essex Ins. Co., 82 A.D.3d at 1327 (quoting (Matter of Mostow v. State Farm Ins. Cos., 88 N.Y.2d 321, 326–327, 645 N.Y.S.2d 421, 668 N.E.2d 392 (1996)).

The Exclusions to the Crime Policy specifically state that they apply to all insuring agreements "unless otherwise specified." (Crime Coverage, p.5) Only two exclusions potentially apply:

> **(B) Acts Committed By the Insured**
>
> > Loss resulting from **Theft** or any other dishonest or criminal acts committed by the **Insured** whether acting alone or in collusion with others.
>
> **(C) Acts of Employees, Managers, Directors or Trustees**

> Loss resulting from **Theft** or any other dishonest or criminal act committed by any of the **Insured's Employees**, managers, directors or trustees whether acting alone or in collusion with other persons or while performing services for the **Insured** or otherwise except when covered under Insuring Agreement 1.

Because the Exclusions in Part V of the Crime Policy directly conflict with the provisions in the Insuring Agreement which provide coverage for Employee Theft, the policy contains a patent ambiguity which must be construed in favor of coverage. The "Insured" means any Insured Entity. "Insured Entity", in turn, means the "Named Entity" (US Datanet) and "any Subsidiary" (USD CLEC). Thus, Insured Entities under the policy are always corporations. A corporation can only act through its employees. In this case, US Datanet acted through Richard Shaw. On the one hand, the policy provides coverage for theft committed by an employee, and on the other hand denies coverage for theft committed by an employee. Construing the insuring provision and the exclusions in accordance with applicable law and in favor of coverage, the Crime Policy provides coverage for the money damages in the final judgment entered against its insured, US Datanet.

## B.  HARTFORD FIRE

Hartford Fire issued a Commercial General Liability Policy bearing policy number 01UUNGF6575 to US Datanet, which was effective on July 1, 2007 and expired on July 1, 2008 and was in effect on the date of loss. The Insuring Agreement provided in the Commercial General Liability Policy provides that Hartford Fire will "pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damages" to which this insurance applies.

The Commercial General Liability Policy includes an Imputed Liability Endorsement which provides coverage for "property damage":

(1) Arising out of an intentional or willful act;

(2) Caused by an "occurrence" as defined below; and

(3) For which the insured is legally liable.

(DE.78-1, p.110)

The Policy's definition of "property damage" includes "loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the 'occurrence' that caused it." (DE.78-1, p.109) The Endorsement defines "occurrence" as follows: "From the standpoint of the insured, an accident, including continuous or repeated exposure to substantially the same general harmful conditions." (DE.78-1, p.110)

In the underlying action, CRT alleged and proved, in part, that US Datanet and USD CLEC deprived CRT of its property, and in so doing, caused damages. As a result, US Datanet and USD CLEC are legally liable for those damages. While US Datanet's employees willfully refused to return CRT its property, they did so based on the advice of legal counsel and a mistaken belief that US Datanet owned the hardware under the Rental Agreement. (DE.80-1, p.16) The loss US Datanet and USD CLEC sustained by way of the final judgment comes within the Imputed Liability Endorsement to the Commercial General Liability Policy. Hartford Fire is contractually obligated to "pay those sums that the insured becomes legally obligated to pay as damages" because of the property damage to which the Commercial General Liability policy applies.

## IV.   CONCLUSION

Based on the foregoing, CRT moves this Honorable Court to enter an order granting final summary judgment in its favor as to its First Affirmative Defense, Counterclaim, and Third Party Claim and determining, as a matter of law, that Twin City and Hartford Fire have a duty to

indemnify their Insureds, US Datanet and USD-CLEC, for the final judgment entered against them in the underlying action.

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 22, 2014, I e-filed this document using the CM/ECF system.  I further certify that I am unaware of any non-CM/ECF participants.

/s/ Kevin Smith
Kevin C. Smith, Esquire of
Lytal, Reiter, Smith, Ivey & Fronrath, L.L.P.
515 N. Flagler Drive, Suite 1000
West Palm Beach, FL 33401
Phone: (561) 655-1990
Fax:    (561) 832-2932
Attorney for Plaintiff
Florida Bar # 861030